IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS

JAMES RANDAL LOUK,
                    Plaintiff,

v.                                                          Civil Action No. 2:16-CV-9
                                                            (JUDGE BAILEY)

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,
                    Defendant.

## REPORT AND RECOMMENDATION/OPINION

James Randal Louk ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Defendant, Commissioner of the Social Security

Administration ("Defendant"), denying Plaintiff's claim for disability insurance benefits ("DIB")

under Title II of the Social Security Act, as well as a claim for supplemental security income

under Title XVI. The matter is awaiting decision on cross motions for summary judgment and

has been referred to the undersigned United States Magistrate Judge for submission of proposed

findings of fact and recommended disposition. 28 U.S.C. § § 636(b)(1)(B); Fed. R. Civ. P. 72(b);

L.R. Civ. P. 9.02.

## I.      PROCEDURAL HISTORY

Plaintiff filed an application for DIB on February 9, 2012, and for SSI on February 10,

2016, alleging disability beginning on March 1, 2006 (R. 68). Plaintiff alleged disability on the

basis of the following impairments: "black outs," headaches, dizziness, confusion, blurry vision,

paranoia, swelling, inflammation, and hot flashes. Id. Plaintiff's applications were denied at the

initial and reconsideration levels. Plaintiff thereafter requested a hearing, which Administrative

Law Judge ("ALJ") Jacqueline Haber held on January 10, 2014.  Plaintiff (represented by

1

Andrea Pecora and Associates generally, and non-attorney representative Jennifer Larosa at the hearing) and Vocational Expert ("VE") Larry Ostrowski testified at the hearing. On February 6, 2016, the ALJ entered a decision finding Plaintiff was not disabled (R. 8). Plaintiff appealed this decision to the Appeals Council and, on February 18, 2015, the Appeals Council denied Plaintiff's request for review (R. 3). Thus, the ALJ's decision is the final decision of the Commissioner.

## II.    FACTS

### A.  Personal History

At the hearing, Plaintiff testified to his personal history. He was born on May 11, 1967, making him forty-six (46) years old at the time of the hearing (R. 37). Plaintiff lives alone (R. 38). He graduated from high school and attended vocational school, where he studied HVAC (heating and cooling) (R. 39).

### B.  Medical History Summary

#### 1.  Medical History prior to March 1, 2006

Plaintiff was admitted to the Emergency Room on November 15, 1993 after being assaulted (R. 249). Plaintiff sustained visible injuries to his head, including lacerations and bleeding on his right orbital and posterior skull, hematomas, swelling, and two loose teeth (R. 251). Dr. Eli Fink ordered a CT of Plaintiff's head without contrast, which identified no fractures (R. 253). A CT of Plaintiff's facial bones, however, showed nasal bone and nasal septal fractures, as well as soft tissue emphysema (R. 250). Plaintiff was given instructions on how to care for his wound sutures, and referred to plastic surgery (R. 252). Plaintiff reported again to Davis Memorial Hospital Emergency Room with complaints of dizziness and headaches lasting for a week on May 19, 2005 (R. 259). He reported sleeping a lot and decreased energy. Id. On

August 19, 2005, another CT without contrast of Plaintiff's head was performed pursuant to continued complaints of dizziness (R. 263). Results were unremarkable, with no sign of intracranial hemorrhage or edema. Id.

### 2. Medical History after March 1, 2006

On January 12, 2009, Plaintiff reported to Barbour Health & Rehabilitation for head pain (R. 274). His prognosis at that time was listed as "good," with "progress as expected" (R. 275). On January 14, 2009, Plaintiff was again seen at Barbour Health & Rehabilitation with complaints of sinus headaches, dizziness, loss of consciousness and blackouts, sudden collapses, temporary lack of understanding, difficulty swallowing, ringing in his hears, blurred vision, double vision, and diminished vision (R. 278). He reported that these symptoms began suddenly in December of 2004 (R. 276). Plaintiff described the sensations as dull, sharp, throbbing, and shooting; he rated the intensity as "severe," and the frequency as "constant." Id. Activities made his symptoms worse, and they improved with rest. Id. He reported having tried store-bought or home remedies as well as seeking other professional care, with poor effect. Id. He rated his current pain level on January 15, 2009 as five (5) on a scale of one (1) to ten (10) (R. 272).

On January 20, 2009, there was no change in his condition or complaints; his pain was still rated as a five (5), he was still missing work, feeling "foggy" and dizzy, and "sinus" was also listed (R. 270). Plaintiff indicated that it caused him to miss work. Id. On January 22, 2009, Plaintiff complained of worsening head pain, rated six (6) on a scale of one (1) to ten (10), and continued to miss work. (R. 268). His prognosis at that time was downgraded to "fair," with progress "slow but steady" (R. 269).

On August 10, 2012, Plaintiff saw Certified Physician's Assistant Karen Spotloe, PA-C at Belington Community Medical Services Association (R. 314). His chief complaint was

"blurriness, confusion, disconnected from time? [sic]" noting "[Plaintiff] was beaten in 1995 and memory is not as good as it once was." Id.

On October 10, 2012, Plaintiff underwent another CT head scan following complaints of syncope and blurred vision (R. 305). The results of the CT were unremarkable. Id. On October 29, 2012, Plaintiff was seen again by PA-C Spotloe following an EEG and CT for results (R. 312). Active problems included staring spells, convulsions NEC, and headache syndromes. Id. Review of systems was essentially normal. Id. Plaintiff was referred to a neurologist for headaches and staring spells. Id.

Pursuant to that referral, on December 10, 2012 Plaintiff saw a neurologist, Dr. Rahman (R. 318). At that visit, Plaintiff complained of headaches, dizziness, blurry vision, trouble concentrating, staring, and "los[ing] time" for the past six (6) years, as well as body and joint stiffness. Id. Plaintiff reported tiring easily, and "state[d] he goes to bed & sleeps sometimes for 3 days to 1 week." Id. Plaintiff described his headaches as "dull pressure," and reported they were brought on by stress and anxiety. Id. "Has hot flashes" was emphasized and underlined. Id. Notes indicated review of his prior CT scan, as well as history of traumatic brain injury, migraine headaches, anxiety and depression, and seizure (R. 319).

On January 29, 2013, Plaintiff returned to Dr. Rahman complaining of increased migraine frequency and severity, which affected his taste, and tingling in his fingertips (R. 320). Notes state "Wife [presumably, Plaintiff's girlfriend] states he was like a zombie." Id. Plaintiff stopped Topamax after four weeks and those symptoms stopped, though his headaches continued. Id. Plaintiff was prescribed Propranolol instead (R. 321). He was having headaches two to three times per week at this point. Id. Plaintiff reported being "very sensitive to light" (R.

320). His headaches started back in 2005, and Plaintiff stated he "never has a good day." Id. He also complained of anxiety. Id.

Later that same day, Plaintiff saw PA-C Spotloe, who noted that Dr. Rahman took Plaintiff off Topamax for his headaches because he "didn't tolerate it," and switched him to Propranolol (R. 297, R. 310). Apart from headaches and photophobia (light sensitivity), review of systems was largely normal. Id. Assessment at that visit was "confusion," "staring spells," and "headache syndromes," possibly secondary to allergy triggers (R. 298, R. 311). Plaintiff was referred to an ENT specialist for allergy testing to determine whether allergies might be causing his migraines. Id. He was also referred to a neurologist for increased headaches and staring spells (R. 300).

On February 27, 2013, Plaintiff returned to Dr. Rahman (R. 322). He reported that Propranolol had somewhat helped, in that his daily headaches would go away for one to two hours before returning. Id. Propranolol also did not cause the side effects Plaintiff had experienced with Topamax. Id. He reported that lights aggravate his headaches, and also complained of stiffness in his neck. Id.

On February 22, 2013, Plaintiff was seen in the ENT department complaining of fever, temperature intolerance, fatigue, weight loss, double/blurred vision, nasal discharge, congestion, difficulty swallowing, dizziness, nausea, muscle and joint aches, anxiety with tension headache, and chronic migraine headaches with aura (R. 328). At follow up on March 1, 2013, Plaintiff was seen by ENT specialist J. A. Stalnaker (R. 323). He reported allergies, sinus problems, and migraines aggravated by some foods and pollens. Id. Plaintiff was having headaches daily at this point ("7 days / wk"). Id. Mild rhinorrhea was observed, along with complaints of sore throats and his ears becoming obstructed three to four times per week. Id. Physical examination was

largely normal. Id. The assessment was turbinate hypertrophy (enlargement obstructing nasal passages), "AR," and migraine headaches. Id. Allergy tests were ordered. Id.

Plaintiff then returned to Dr. Rahman on July 30, 2013 for his migraines (R. 331). He reported allergy tests revealed allergies to "17 different things," for which he was taking weekly allergy shots and had 9-10 injections. Id. He reported having four (4) to five (5) migraines per week, with headache pain rated 10/10 at worst, and 6-7/10 at best. Id. Imitrex worked somewhat, but was limited in that it only worked 1-2 times per month. Id. Plaintiff reported that he has to be in darkness due to headaches. Id. He was currently taking Verapramil for high blood pressure and Imitrex for headaches, and also wanted to try Lexapro or Celexa for depression. Id.

On March 29, 2013, Plaintiff reported to Dr. Rahman for follow up (R. 335). An allergy specialist advised Plaintiff that he could not undergo allergy testing while taking Propranolol. Id. Since decreasing Propranolol, his headaches were worse and his heart rate had increased. Id. The advent of allergy season was also making his symptoms worse. Id.

On April 29, 2013, Plaintiff followed up with ENT (R. 341). He reported being off beta blockers for one month, and continued to complain of muscle and joint stiffness. Id. Plaintiff was taking Benedryl to help with his allergies. Id. Rhinorrhea continued, "white to green" with facial pain. Id. Plaintiff reported that his migraines were worse with increased exposure to pollen, and that nose sprays caused headaches also. Id. Examination revealed "mild injection" (redness) of Plaintiff's eyes, continued turbinate hypertrophy, with the addition of mucous, bliny spurs in the nose. Id. Assessment at that visit was "[allergic rhinitis], migraine, intolerant to multiple nose sprays." Id.

On April 30, 2013, Plaintiff again followed up with Dr. Rahman for headaches (R. 332). Migraine frequency had increased to at least five (5) days per week. Id. Plaintiff had gotten

nosebleeds as a result of taking Gabapentin, which stopped when he discontinued it. Id. Imitrex was helping reduce his headaches to 4-5 hours in duration. Id. Plaintiff continued to complain of body stiffness. Id. Plaintiff permanently discontinued Gabapentin due to nosebleeds, and continued on Verapramil and Imitrex. Id. His anxiety continued, and seizures were considered "under control." Id.

On July 18, 2013, a follow up with ENT noted Plaintiff had no decrease in headaches, and continued to have migraines 4-5 days per week with light sensitivity and aura (R. 343). Physical examination revealed continued turbinate hypertrophy as well as medium to mild injection (redness) of the oropharynx. Id. The assessment was allergic rhinitis and migraines; the treatment plan was to continue immunotherapy, and add Veramyst. Id.

On February 26, 2014, Plaintiff was seen at an ENT Clinic pursuant to a referral from PA-C Spotloe (R. 370). After assessment, Plaintiff was scheduled for allergy testing in the allergy clinic, as well as a home sleep test (R. 371).

On March 3, 2014, Plaintiff underwent allergy testing (R. 366). Results indicated allergic reactions to various types of plants and grasses including Timothy, Johnson, June/Kentucky, Ragweed, "grass mix," "weed mix," and "tree mix." Id. Additionally, Plaintiff had allergic reactions to feathers, horse, dog, cat, "mold mix," and TCE (trichophyton, candida, and epidermophyton). Id.

On March 17, 2014, Plaintiff had a nocturnal polysomnograph (sleep study, with EEG, EOG, EMG, and ECG) conducted at Sleep Solutions (R. 359). Plaintiff was diagnosed with obstructive sleep apnea; treatment with CPAP was recommended, as well as weight loss. Id.

On March 26, 2014, Plaintiff was seen at the ENT Clinic to review his polysomnograph results (R. 364). He had excessive daytime sleepiness rated 20/24 on the Epworth sleepiness

scale, as well as fatigue and chronic headaches. Id. Sleep seemed to be improving following the study with the PAP therapy. Id. Diagnoses included obstructive sleep apnea, hypersomnolence, snoring, fatigue, and obesity with BMI of 31.7. Id.

On May 12, 2014, Plaintiff was seen by David Watson, M.D. at WVU Headache Center (R. 373). Dr. Watson's narrative report read as follows:

> [Plaintiff's] headaches began approximately 20 years ago after being assaulted and hit on the head. This got much worse in 2004 while working at a flooring company. They occur approximately 7 times per week all day, and 5 days per week it is extremely severe and he gets swelling around his eyes, visual aura, and can have staring spells (which lasts only 5-10 seconds) They are located on bilateral temporal and across his eye and are described as a sharp, pounding, throbbing type of pam. They are Severe, Very severe in intensity. At worst they are 10/10 and average 6-7/10. Associated symptoms include aggravation by movement, nausea, photophobia, phonophobia, vomiting and osmophobia. The pain is triggered by light, stress, weather changes, spring allergies, bread, pretzels, dairy, and nitrites. The patient is currently treating his headaches with Imitrex 50mg. Past medications tried include propanolol, topiramate, zonisamide, SSRls and gabatril, ibuprofen, naproxen and excedrin. There IS a family history of headaches.

(R. 374). A physical examination was normal in all respects. Id. Dr. Watson diagnosed chronic migraine and sleep disorder, noting "chronic migraine and a problem with poor sleep and anxiety." Id. Dr. Watson doubted that Plaintiff has epilepsy given his report of symptoms and normal EEGs, but "[could] not be certain at this time." Id. He felt it was more likely that Plaintiff's "spells" were more "migraine aura associated." Id. Dr. Watson prescribed prednisone, Elavil, sumatriptan, and tizanidine to help with Plaintiff's headaches. Id.

On June 18, 2014, Plaintiff followed up with Dr. Cross (R. 361). Plaintiff had success with the CPAP machine and was feeling – and resting – better. Id. Screening notes indicated that his reported headache pain, however, had not improved, and was 8/10 on a scale of 1 – 10. Id.

On August 12, 2014, Plaintiff returned to WVU Headache Center for followup:

> [Plaintiff] reports that his headaches have not changed. He is currently taking nothing for prevention and using sumatriptan and tizanidine as needed for his headaches. He also complains of generalized body pain and anxiety.

Severe Headaches· 5 per week
Total Headaches: l per day
Headache Free Days: 0 per week
Headache Description: throbbing pain, pressure type of pain, bilateral in the temporal area. Rated as 10/10.
Response to abortive medications. Fair- Imitrex takes the edge off some of the time, tizanidine helps with sleep.
Side effects to medications. elavil caused severe stiffness in his arms and legs and general ill feeling.

(R. 376). Diagnoses at this appointment included headache, chronic migraine, sleep disorder, and chronic migraine without aura. Id. Plaintiff was prescribed Cymbalta for headache prevention, Maxalt to evaluate if it would be more effective than Imitrex, and was to continue Tizanidine for headache rescue. Id. Dr. Watson discussed the possibility of botox therapy since Plaintiff had failed numerous other medications (Topamax, Zonegran, Neurontin, Inderal, and Elavil), but noted it would not be covered by insurance. Id.

### 3. Medical Reports/Opinions

On March 17, 2009, an MRT review was completed for Plaintiff for the West Virginia Department of Health and Human Resources, pursuant to an evaluation for adult Medicaid (R. 302). Plaintiff's Statement of Incapacity/Disability was that he gets "dizzy, lightheaded, [doesn't] know what is going on, and confusion." Id. Frontal and maxillary pain were noted (R. 303). Major diagnosis was possible petit mal seizures; minor diagnosis was sinusitis. Id. The reviewer opined that Plaintiff was not able to work full time at his customary work, but that he might be able to perform other full time work in the future, if he was cleared to do so. Id. As to work situations, Plaintiff should avoid "anything dangerous." Id. The reviewer opined that Plaintiff would be unable to work full time for at least six months. Id. An EEG was recommended to rule out petit mal seizures, as well as a consult with an ENT specialist (R. 304).

The reviewer referenced Plaintiff's thyroid at multiple points in the MRT review, though it was barely legible and all that could be read in reference to the thyroid was "palpable." Id.

On June 22, 2012, Stephen Nutter, M.D. conducted an internal medicine examination of Plaintiff pursuant to his disability claim based on "dizziness, blurry vision, [and] staring episodes" (R. 283). Dr. Nutter narrated:

> [Plaintiff] was assaulted and hit in the head with a blackjack. This occurred in 1994. For about a year after that, he had headaches and fatigue and then took a job at Armstrong Hardwood and started having further problems with the dizziness and blurry vision. He states that he, at times, will get blurry vision and then has headaches with it. Other days, he denies he has dizziness. Some days, he has episodes of staring. Oftentimes, the blurry vision precedes the episodes of staring. He does not fall down. He states he cannot see or hear and he will just come out of it and there will be someone standing there. He knows where he is. There is no real postictal period. There is no falling down or loss of consciousness with convulsions, bowel or bladder incontinence or biting the tongue. There is no real grand mal seizure-type activity described. He has to sit and stare. He states he was told it usually lasts one to two minutes. At times, he gets dizziness with the blurry vision. Bending over and turning his head quickly will also make him dizzy. Dizziness can last for days at a time. He usually just lies down and sleeps it off. Sometimes, he has to lie down for a couple of days to get it to go away.
> The claimant reports problems with fatigue and lack of energy, feeling tired all the time. Then, he gets headaches at the temples on a daily basis. It is a pressure-type pain and lasts up to 12 hours. It causes nausea, vomiting, and photophobia. It is rated a 10 on a scale of 1 to 10. There is an aura associated with the headaches. He states he has had about 3 episodes where he has just blacked out for a few seconds and then come back to. No seizure activity was noted when that happened. The last time was in 2011 after he was mowing his yard. He reports pain about once a month. He will start jerking. He states that, "It's like you get a big jerk in your shoulders" or somewhere in his body.

(R. 283-84). Plaintiff reported he can walk a quarter-mile on flat ground before becoming short of breath and having to stop and rest (R. 284). He also reported intermittent joint pain beginning after his assault in 1994, but has not had imaging studies, injections, or aspirations on his joints. Id.

Dr. Nutter performed an examination of Plaintiff and found most systems normal (R. 286). As to Plaintiff's problems with joint pain, Dr. Nutter found decreased range of motion in

the knees, though no pain, tenderness, or swelling in the joints was evident (R. 287). Dr. Nutter's impression was 1) dizziness, 2) possible petit mal seizures, and 3) arthralgias (R. 286).

On August 27, 2012, Sharon Joseph, Ph.D., conducted a psychological evaluation of Plaintiff (R. 289). Plaintiff was neatly and cleanly dressed (R. 291). He was cooperative, alert, and oriented, with appropriate posture, normal speech, and average eye contact. Id. Plaintiff denied appetite disturbance, suicidal or homicidal ideations, or preoccupations, obsessions, or compulsions. Id. His insight appeared adequate. Id.

Plaintiff's mood was "depressed and somewhat anxious," with "nervous" motor activity. Id. His affective expression was "flat" (R. 292). Plaintiff reported sleep disturbance – "primarily waking up frequently during the night" (R. 291). Dr. Joseph observed:

> [Plaintiff] states "my whole body gets stiff for about three days" and he cannot move after he tries to do certain things. He states that he has difficulty moving his hands once or twice a week. They get very stiff. He also states that he has episodes of dizziness when he walks at times. No obvious physical limitations were noted relative to hearing or speech. He does report difficulty at times with blurring of his eyes He also states that he has side temple headaches. He also states "if I get stressed, that can cause blurriness in my eyes and then I just stare."

Plaintiff's Full Scale IQ score on the Wechsler Adult Intelligence Scale (WAIS-IV) was 67, which fell "in the mild mentally impaired range of intellectual functioning" (R. 291). Dr. Joseph also administered the Wide Range Achievement Test (WRAT-4), but considered the results not valid because Plaintiff's blurry vision affected his performance, and due to consistency concerns. Id. Plaintiff's immediate and remote memory were within normal limits, though recent memory was moderately impaired (R. 292). His concentration was likewise moderately impaired. Id. Judgment was within normal limits. Id.

Plaintiff's daily activities consist of getting up at 5:00 a.m. and watching television in the afternoons and evenings, until he goes to bed at 8:00 p.m. (R. 292). He can do some household

chores, including making his bed, washing dishes, putting groceries away, and taking out the trash. Id. He sometimes remembers to turn off the stove, and can sometimes vacuum. Id. Plaintiff cannot mow grass, as he passed out twice while mowing the lawn previously. Id. Plaintiff has not driven in five years, as he let his license expire. Id.

Plaintiff "used to have friends . . . before 2005;" now, he has just a girlfriend (R. 292). He likes to spend time outdoors in the mountains and walk. Id. Plaintiff's interactions were appropriate, and his socialization was considered to be within normal limits. Id.

Dr. Joseph diagnosed adjustment disorder with depressed an anxious mood, and considered his psychological prognosis to be fair (R. 292). Dr. Joseph was unable to determine Plaintiff's capabilities due to his difficulty with the testing. Id.

### a. DIB at the Initial Level

#### i. Mental Residual Functional Capacity

On July 18, 2012, Frank Roman Ed.D. reviewed the psychological evidence and indicated three medically determinable impairments: affective disorders (primary, non-severe), unspecified arthropathies (secondary, non-severe) and "other disorders of the nervous system" (other, non-severe) (R. 71). Dr. Roman found mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation (R. 72).  Dr. Roman found that Plaintiff's medically determinable impairments could reasonably be expected to produce his pain or other symptoms, but that the objective medical evidence alone could not substantiate Plaintiff's subjective complaints, because Plaintiff's lack of a significant psychological treatment history resulted in insufficient evidence to make a determination (R. 73). Dr. Roman found Plaintiff partially credible with regard to the severity of his depression symptoms, based on

insufficient evidence. Id. A concurrent initial claim, also dated July 18, 2012, arrived at the same conclusion: "The claimant has not sought treatment and there are not any records for the relevant time period of the AOD through the DLI. Therefore, there is insufficient evidence to assess the conditions upon functioning prior to the DLI" (R. 78).

### b. DIB at the Reconsideration Level

### i. Mental RFC

James Bartee, Ph.D. completed a DIB at the Reconsideration level on July 10, 2012 (R. 84). Four non-severe impairments were listed: affective disorders (primary), unspecified arthropathies (secondary), anxiety disorders (other), and "other disorders of the nervous system (other) (R. 87). The *combination* of the four non-severe impairments, however, was listed as "severe." Id. Dr. Bartee found mild restriction of activities of daily living; mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. Id.

Plaintiff was considered "partially credible" with regard to psychological symptoms because the medical evidence of record was "in partial accord" with his allegations (R. 89). Plaintiff was found to have understanding and memory limitations, and was "moderately limited" in ability to maintain attention and concentration for extended periods (R. 90). He was "moderately limited" in ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 91). Dr. Bartee indicated that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged psychological symptoms, but the limitations noted did not meet or equal a listing. Id. Thomas Lauderman, D.O. performed a DIB consideration at the Reconsideration level signed August 10,

2012, finding "insufficient [medical evidence of record] to assess case on or before date last insured," and that the "initial assessment of this issue remains correct" (R. 96).

### c. Headaches Residual Functional Capacity Questionnaire

On December 18, 2013, Dr. Rahman completed a Headaches Residual Functional Capacity Questionnaire (R. 346). Dr. Rahman treated Plaintiff for severe headaches for the past year, seeing him every month to three months as needed. Id. Dr. Rahman diagnosed four distinct types of headaches, including 1) migraine headaches, 1) tension headaches, 3) chronic daily headaches, and 4) post-traumatic headaches; additional diagnoses included 5) traumatic brain injury; 6) complex partial seizures; and 7) allergies. Id. As to the nature, location, and intensity of Plaintiff's headaches, Dr. Rahman indicated severe and frequent migraine and mixed type headaches, primarily involving stabbing pain in the bilateral frontal and temporal areas. Id. Migraine frequency was four to five days per week, with average duration of four to five hours (R. 347). Symptoms associated with these headaches include blurred vision, vertigo, memory impairment, nausea, neck stiffness, performance and personality change, visual aura, photophobia, phonophobia, and flashing lights (R. 346). Additional symptoms included malaise, mental confusion, and inability to concentrate (R. 347).

Plaintiff's headaches are triggered by bright lights, lack of sleep, noise, stress, strong odors, vigorous exercise, changes in weather, hunger, and certain foods (R. 347). Plaintiff's headaches are exacerbated by bright lights, coughing or straining, movement, and noise. Id. Plaintiff's headaches are improved by lying in a dark room and pressure/massage (R. 348). Plaintiff's headaches could be explained by history of head injury, migraine, seizure disorder, and anxiety or tension. Id. Test results and objective signs of Plaintiff's headaches included impaired sleep and a negative CT scan. Id. Dr. Rahman opined that Plaintiff was not a

malingerer. Id. Emotional factors contributed "somewhat" to the severity of Plaintiff's headaches. Id.

Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described (R. 348). His impairments had lasted, and were expected to last, more than twelve months (R. 349). Plaintiff's prognosis was listed as "chronic migraine" (R. 349). Dr. Rahman opined that, during a headache, Plaintiff would not be able to perform even basic work activities and would need a break from the workplace. Id. He would further sometimes need to take unscheduled breaks during an eight hour workday, at least a couple of times per week. Id. On such occasions, Plaintiff would have to lie down and rest for twelve (12) hours before returning to work (R. 350). Dr. Rahman felt Plaintiff could tolerate only low stress jobs. Id. Plaintiff's impairments were likely to produce "good days" and "bad days." Id. On average, Plaintiff was anticipated to likely be absent from work more than four times per month. Id. Dr. Rahman identified Plaintiff's limitations in lifting, bending, stooping, and crouching, Plaintiff's limited vision, and Plaintiff's need to avoid temperature extremes, noise, dust, fumes, gases or hazards as affecting his ability to work at a regular job on a sustained basis. Id.

On December 23, 2013, PA-C Spotloe also completed a Headaches Residual Functional Capacity Questionnaire (R. 357). Her diagnoses were 1) traumatic head injury, 2) migraines, 3) complex partial seizures, 4) post-concussion syndrome, 5) depression, and 6) anxiety (R. 352). Plaintiff experiences severe headaches daily on both sides of his head; they are painful, throbbing, and stabbing in nature, and frequently rated 10/10 on a pain scale. Id. Plaintiff had to discontinue Topamax due to side effects. Id. She noted that "Imitrex will help, but only brings pain to a "5" on 1-10 scale," and that "headaches will still persist." Id.

Symptoms associated with Plaintiff's headaches include nausea/vomiting, visual disturbances, mental confusion/inability to concentrate, and sensitivity to light, sound, and smell (R. 353). Frequency of headaches ranged from "3-4 times a week up to daily," lasting approximately 5-6 hours. Id. Plaintiff's headaches are triggered by bright lights, lack of sleep, noise, stress, strong odors, vigorous exercise, weather changes, hunger, perennial allergies, and some foods. Id. His headaches are exacerbated by bright lights, coughing or straining, movement, and noise. Id. His headaches are made better by lying in a dark room, pressure/massage, cold/hot packs, sleeping a lot, and Imitrex "as far as meds go to a certain extent" (R. 354).

Positive tests results and objective signs of Plaintiff's headaches included tenderness, impaired sleep, and impaired appetite or gastritis (R. 354). PA-C Spotloe also wrote "Just any prolonged discussion upsets [Plaintiff;] he can't sit for long periods, becomes extremely nervous/agitated which insights [sic] a [headache]." Id. Impairments that could reasonably be expected to explain Plaintiff's headaches included anxiety/tension, history of head injury, migraine, and seizure disorder, though she noted that Plaintiff had "not had a seizure in [over a] year," because if he feels a migraine starting, he rests." Id. She opined that Plaintiff was not a malingerer; his impairments were reasonably consistent with the symptoms and functional limitations described. Id. PA-C Spotloe opined that emotional factors contributed to the severity of Plaintiff's headaches very much. Id.

As to treatment, Plaintiff currently takes Imitrex but as discussed, the response is limited and "he always has dull persistent pain" (R. 355). Plaintiff had discontinued Topamax because of intolerance; he experienced nausea, vomiting, diarrhea, and numbness in his fingers. Id. He

discontinued Gabapentin as well because of anemia. Id. Plaintiff was currently being weaned off Lexapro at that time because it caused hallucinations and weird dreams. Id.

Plaintiff's impairments lasted and were expected to last at least twelve (12) months, as his headaches have been worsening since 2004 (R. 355). Plaintiff's prognosis was "poor." Id. He would be precluded from performing even basic work activities during a headache. Id. He would further need to take unscheduled breaks during an 8-hour workday on a daily basis. Id. On such occasions, he would have to lie down or sit quietly in a dark space (R. 356). PA-C Spotloe was unable to determine how long he would have to rest before returning to work (R. 355). Plaintiff's impairments were likely to produce "good days" and "bad days" (R. 356). She opined that Plaintiff was incapable of even low stress jobs, because he "does not handle any stress well [at] all," and she anticipated him "breaking down and having to leave." Id. Additionally:

> [Plaintiff] can't tolerate any prolonged activities. He must constantly wear very dark tinted sunglasses to avoid any bright or glaring lights – which affect him very quickly. Any noise will trigger his anxiety and worsen headaches.

Id. As to whether any additional tests or procedures would be advisable to fully assess Plaintiff's impairments, PA-C Spotloe explained that Plaintiff has already seen neurology and had CT, MRI, and EEG, leaving nothing outstanding. Id. She "[does] not feel he is a candidate for any job. With his past head injury, current [headaches] and anxiety (extreme within minutes if triggered), he is not suitable for work." Id.

### C. Testimonial Evidence

At the hearing, Plaintiff testified to his personal history. He was born on May 11, 1967, making him forty-six at the time of the hearing (R. 37). Plaintiff lives alone (R. 38). He graduated from high school and attended vocational school, studying HVAC air conditioning (R. 39). He last had a valid driver's license in 2006; after his migraines started and caused him to

"see things come out of the side of the roads that wasn't there and stuff," Plaintiff did not renew his driver's license again (R. 39). His girlfriend, who lives separately in her own home, drove him to the hearing. Id.

Plaintiff can read, write, and do simple math (R. 40). His girlfriend takes care of his finances and pays his bills now because he gets blurred vision when reading, and gets confused generally. Id. His mother, who lives in Cleveland, pays all of his bills (R. 41). Plaintiff has a computer, but only uses it once a week for five minutes, because he "can't stand the lights on." Id. Plaintiff does not smoke, drink, or take drugs not prescribed by a physician. Id.

Plaintiff last worked on March 1, 2006 for Armstrong Wood Products as a "rip operator" in the maintenance department, where he removed knots from wood flooring and changed blades on conveyor belts (R. 43). He was terminated from his job due to his health problems:

> Q:     Because of my bad headaches I was having and blurred vision, and I passed out at work one time, and I was driving to work, and I had to pull in, and they sent me to a doctor, and my doctor -- we kept -- I was off like two weeks, and then they sent me back and back, and then finally they had enough of me. They let me go.
> Q:     Okay. So you were terminated because of your absenteeism?
> A:     Because -- I was terminated, but then I went for unemployment, and they said because I was terminated that I couldn't get that, but I had records showing that I had doctor stuff.

(R. 41). In this job, Plaintiff frequently lifted 100 pounds; sometimes as much as 150 pounds (R. 43). Plaintiff estimated that he stood for eleven (11) hours out of a twelve (12) hour shift, sitting only for lunch. Id. Plaintiff took it upon himself to perform supervisory functions over the other employees in his department, though in an unofficial capacity (R. 44).

Prior to working at Armstrong, Plaintiff worked for David Wilson (D&W) as a serviceman (R. 45). He made house calls for repairs of air conditioning, plumbing, and heating. Id. He was on his feet essentially the entire day, except when he was driving to client's homes (R. 46). In this position, he lifted up to two hundred (200) pounds; lifting at least one hundred

(100) pounds regularly. Id. He also did some construction, sometimes framing, roofing, and working with concrete (R. 47). Plaintiff held two professional licenses previously – an electrical license, and an HVAC license, both of which have expired. Upon completing school, he apprenticed with Upgrade Housing doing plumbing, HVAC, and electrical work (R. 47-48).

Plaintiff testified that the health problems giving rise to the current case began when he was assaulted in 1994:

> After he hit me, I was a little different. I had headaches once -- it didn't bother me, but in '04 --December of '04, I can -- it just blew up on me. I don't know what happened; it just started getting dizzy at work all the time, and started them pounding headaches, pound the sides of my head, and the confusion; I couldn't talk to nobody. I lost most of my friends and everything and stuff. Yeah, '04 was a bad year.

(R. 48). Plaintiff had been working a night shift at the time and described that as "a little stressful, because [he] never worked that kind of shift before" (R. 49). Going back to a day shift did not help; "it just kept getting worse and worse and worse, all the time." Id.

Plaintiff's non-attorney representative, Andrea Pecora, examined him with regard to his migraines and treatment. He was treated by Karen Spotloe, a certified physician's assistant at a family doctor, and Dr. Rahman, a neurologist, for his migraines (R. 50). Dr. Rahman prescribed Plaintiff Imitrex and Zonegran for his migraines, which he just recently started. Id. Previously, Plaintiff tried taking Topamax, but it gave him nose bleeds and made his headaches worse. Id. The "other stuff" Plaintiff tried gave him "real bad nightmares," and he couldn't sleep. Id.

Despite the medication Plaintiff is currently on, he has migraine headaches four to five days per week (R. 51). The ALJ inquired about about Plaintiff's migraine headaches:

> Q:     How long do they typically last?
> A:     They vary. They could last from four hours to three days, four days. I'm, you know, in bed.
> Q:     Tell me about the pain that you associate with these migraine headaches. How severe is it?
> A:     Oh, it makes me cry. It'll start on one side of the face, and it goes over to the other

side, the side of my face, it just – it's terrible.

Q:      Okay. How do you generally spend your time when you have one of these types of headaches?

A:      In bed. I go to sleep. Find a dark room. It's one thing a cold, dark room. That's the only thing that even gives me any kind of relief.

Q:      Okay. Other than the obvious headache pain that you have associated with the migraines, what are some other symptoms you have?

A:      I get real nauseous, I see flashes of lights all the time; they're always in my eyes when it starts. It just does that; confusion. I could be talking to somebody, and I'll be staring at them and just, I don't know what you're telling me. I just stare at you, don't know what you're telling me.

Q:      Okay. Now the sunglasses that you're wearing today, how often do you use them?

A:      All the time. I have to have them. It just – it'll start – even right when we come in here, I started getting it. I could just feel it starting to come on, and lights and stuff. So I wear them constantly, it's so bad.

Q:      How long have you been using them?

A:      Since probably '08, '07.

(R. 51). Plaintiff testified that his headaches are definitely triggered by lights and stress; he has also noticed that allergies, food, and changes of weather seem to trigger them as well, though he is still trying to "find all that stuff out" (R. 52). Exertion and movement also trigger his headaches; he estimated that he could lift "probably 10 pounds" before it "starts." Id. Plaintiff further testified:

A:      On days that it's not -- it never goes away. My headaches just never go away; they just diminish some, like from a 10 to a 7. I might get out and walk to the mailbox and stuff, but I got to be -- if I see a flashing light or any kind of nauseous home and into bed, because it'll last longer if I don't go to bed and take care of it. It'll just -- that's just one of the days it's four or five days I'm in bed.

Q:      Okay. Do you have any problem standing?

A:      When that's going on, yes. I can't even get out of bed and walk to go to the bath room, hardly. You know, I don't take a shower for a week at a time because of it.

Q:      All right. Does Dr. Rahman feel that this is related to your prior head injury?

A:      Yes. That's what they're telling me they think. And I asked him, I said, Like 10 years later? That was 10 years – he said that could just happen; something triggered it and it took off, because it triggered it fast; it was really fast.

Q:      Did he tell you what to expect as far as the future or discuss any other types of treatments with you?

A:      He just told me that there's drugs out there, and he just hundreds of them, thousands of them, he says, that we can try and just keep trying. Three months, if something doesn't work, we'll take you off of it, try it three months, try it like that.

Q:     Okay. Have any of the medications you've tried up to this point controlled the migraines?

A:     The only thing that even diminishes it any is that Imitrex. And I can only take it once a week or it does not work. But it will diminish it from a 10 to a 7, and then I can, you know, get up and go to the bath, take a shower and stuff like that on them days.

Q:     Okay. Tell me about your seizure activity.

A:     That's he's --Dr. Roman says that's when I get so -- when I try to fight it all the time that I work a migraine into them seizures, and that's when I would stare at people. I'd be just standing there and people wonder what I'm doing at work, and hit me, because I would just stare out in the things. So I try not to fight that stuff anymore.

Q:     So how long has it been since you've had that type of seizure activity?

A:     Oh, six months, a year, something like that, because I -- if I get stressed or anything, I quit. I try not to give it that far anymore.

(R. 53-54). Plaintiff's seizure activity first started in 2006, when he passed out at work (R. 55). Plaintiff had taken antidepressants Dr. Roman prescribed for depression, but stopped taking them recently due to bad side effects he experienced – "Hallucinations, things were weird, at night . . . I'd see things moving." Id. As a result, he is not taking any medications for depression. Id. The symptoms he experiences from depression include fatigue, stiffness in his shoulders and "all over," moodiness, and uncontrollable crying spells (R. 56). As to his social functioning, Plaintiff testified:

A:     I used to be a really outgoing guy, be out in the woods with my friends. But I have lost almost all my friends, because they come over, you know, and I can't do nothing. They just leave and stuff. And I don't call them no more or answer the phone or even answer the door... I lock myself in the house.

Q:     How long has that been the case?

A:     That's been five or six years going on; since '07, '8.

(R. 56-57). Now, he leaves his house three or four times a month to attend doctor's appointments, or if he is having a good day, he might accompany his girlfriend to the store, though he has to stay in the car because the lights inside trigger his headaches.

       Plaintiff can prepare food in the microwave when he is not having a migraine (R. 57). He no longer cooks on the stove because he left it turned on one night when he went to bed. Id. His

girlfriend will make him large batches of food, like a whole lasagna, that he can keep in the refrigerator and heat up in the microwave. Id. As to household scores, on good days, Plaintiff tries to do laundry and pay bills, but he can't do that for very long and needs his girlfriend's help. Id. Plaintiff estimates that his girlfriend does eighty-five (85) to eighty (80) percent of his household chores for him. Id.

Plaintiff tries to do yard work "once in a while" because he feels bad that his girlfriend has to do it, but ten (10) minutes is all he can manage before he has to stop (R. 58). As to hobbies, outdoor activities – being in the mountains, fishing, camping, and hiking – used to be a big part of Plaintiff's life. Id. He stopped doing those things around 2008 after he found himself getting confused on walks and not being sure how to get back. Id. This scared him because he was in a place he had been "a million times" and was familiar with. Id.

When Plaintiff is not in bed, he tries to watch a little television with the brightness turned all the way down so he can "stand watching it" (R. 59). He will also sit on his porch, go for a little walk, or try to do household chores. Id. "But nothing that I – I said I have to stop if something – them lights start, if I get nauseous, I have to stop everything." Id.

Plaintiff was tested for allergies and was allergic to seventeen different things, including pollen, ragweed, and grasses; dust and mold, pets, and certain foods such as wheat, oranges, and bananas (R. 59-60).

### D. Vocational Evidence

Larry Ostrowski, an impartial vocational expert (VE), also testified at Plaintiff's administrative hearing. The VE testified that Plaintiff's prior work as a ripsaw operator is medium and semiskilled, with a Specific Vocational Preparation ("SVP") of 4 (R. 62). Plaintiff's prior work as a "heating and air conditioning installer/servicer" is medium and skilled, with an

SVP of 7. <u>Id</u>. Plaintiff's prior work as an electrician is classified as medium and skilled, with an

SVP of 7. <u>Id</u>. Plaintiff's prior job as a construction worker is heavy and semiskilled, with an SVP

of 4. <u>Id</u>. The ALJ posed the following hypothetical to the VE:

> Q     Okay. Thank you. I'd like you to assume an individual with the same age, education, and past work experience as the claimant, with the following: This individual is capable of work at all exertional levels as defined by the regulations. However, he can never climb ladders, ropes or scaffolds and can only occasionally climb ramps or stairs. He must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, and vibration.
> He must avoid concentrated exposure to all respiratory irritants, such as fumes, odors, gases, poorly ventilated areas, and chemicals.
> He must avoid hazards such as dangerous moving machinery and unprotected heights, and he cannot operate a motor vehicle.
> Would such a person be able to perform the claimant's past work, either as he actually performed the work or as those occupations are generally performed?
> A:    No, Your Honor.
> Q:    He could not do his past work?
> A:    No, Your Honor.

(R. 63). The ALJ identified four other jobs available in the regional economy he believed that

Plaintiff could perform, including two "medium" jobs - dining room attendant (skilled, SVP 2)

and hand packager (unskilled, SVP 2) – three "light" jobs – office helper (unskilled, SVP 2)

marker (unskilled, SVP 2), and mail clerk (unskilled, WVP 2) – and two "sedentary" jobs –

charge account clerk (unskilled, SVP 2) and telephone quotation clerk (unskilled, SVP 2) (R. 64-

65).

> Q    Thank you. Now, I'm just going to ask you -- I know all the jobs that you gave me were unskilled. If we added a limitation to simple, routine, repetitive tasks with no strict production quotas, fast pace, or production-line type of activities, would that affect these jobs in any way?
> A    No, Your Honor. All the jobs I gave were unskilled jobs.

(R. 65). The ALJ next inquired as to time off task and absenteeism:

> Q:    Now, what are the tolerances for time off task in the type of jobs that you've named?
> A:    There are studies that show that an individual can be off task up to 10 percent of a work period and still generally be able to maintain levels of productivity required

> Q: And how about for absenteeism?
> A: It's my experience in working with employers that they will tolerate an individual being late for work, leave work early, or miss an entire day, and they will tolerate up to two incidents in a month's time before the individual may experience consequences regarding the incidents.

Id. Ms. Larosa had no questions for the VE, but commented that Dr. [Rahman] opined Plaintiff would miss more than four days per month (R. 66).

### E. Work History Report and Disability Reports

#### 1. Work History Report

On February 23, 2012, Plaintiff completed a Work History Report with the help of his girlfriend, Darla Feiler (R. 210). As a "machine operator," Plaintiff "operatored [sic] and repaired a re-rip saw, knot saw, rip saw, planer, conveyor belts/rollers, chains, drove forklift" (R. 204). In this position, Plaintiff worked a twelve (12) hour day, four (4) days per week. Id.  Each work day, Plaintiff walked for six (6) hours, stood for twelve (12) hours, climbed for thirty (30) minutes, stooped for one (1) hour, kneeled for one (1) hour, crouched for one (1) hour, crawled for thirty (30) minutes, handled big objects and reached for eleven (11) hours, and handled small objects for eleven (11) hours. Id. He lifted wood and machine parts up to one hundred (100) pounds, and carried them for thirty (30) feet daily. Id. Plaintiff frequently lifted fifty (50) pounds. Id.

As a "service worker," Plaintiff installed and repaired heating and cooling units, electrical units, and plumbing; he also framed housing and did block work (R. 205). He worked ten (10) hours per day, four (4) days per week. Id. Each work day, Plaintiff walked and stood for ten (10) hours, climbed for five (5) hours, kneeled and crouched for two (2) hours, crawled for three (3) hours, handled big objects for ten (10) hours, reached for eight (8) hours, and handled small

objects for six (6) hours. Id. Plaintiff lifted up to one hundred (100) pounds per day, frequently lifting at least fifty (50) pounds. Id.

As an "apprentice – heating & cooling," Plaintiff assisted with installing and repairing heating and cooling, electrical, and plumbing (R. 206). He worked eight (8) hours per day, five (5) days per week. Id. Each work day, Plaintiff walked, stood, crawled, and handled big objects for eight (8) hours; reached and handled small objects for six (6) hours; climbed and crouched for four (4) hours; stooped and kneeled for two (2) hours. Id. Plaintiff lifted up to one hundred (100) pounds, and frequently lifted fifty (50) pounds. Id.

## 2. Disability Report

On February 10, 2012, Plaintiff completed a Disability Report with demographic, work, and medical information (R. 192). His listed conditions causing limitations included inflammation, black outs, dizziness, confusion, headaches, blurry vision, paranoia, fatigue, swelling, and hot flashes (R. 193). These conditions caused him to make changes in his work activity on February 1, 2005. Id. He stopped working on March 1, 2006 because of these conditions. Id. Apart from a brief work history and some basic medical information, other questions were left blank, and others were completed in a manner that did not correspond particularly well to the question. Subsequent disability reports were similar (R. 223; R. 230; R. 238).

### a. Detailed Management Diary – Headaches

Plaintiff kept a diary of his headaches for a number of months, in which he rated the severity, duration, and symptoms of his headaches on each day of the month.

In February 2013, on a scale of one (1) to ten (10), the severity of Plaintiff's headaches

ranged from seven (7) to ten (10). (R. 246). On the majority of days in February, Plaintiff's headaches lasted thirteen (13) to twenty-four (24) hours; on eight (8) days that month, they lasted from four (4) to twelve (12) hours. Id. Plaintiff had sensitivity to light, sensitivity to sound, and "disconnect" every day that month, and frequently experienced throbbing, nausea, aura, and light-headedness. Id. Plaintiff was able to function on six (6) days that month, and was unable to function on twenty (20) days. Id. His medication included Proplapolo [sic]. Id.

In March 2013, on a scale of one (1) to ten (10), the severity of Plaintiff's headaches ranged from seven (7) to ten (10). (R. 245). On the majority of days in March, Plaintiff's headaches lasted thirteen (13) to twenty-four (24) hours; on nine (9) days that month, they lasted from four (4) to twelve (12) hours. Id. Plaintiff had sensitivity to light, sensitivity to sound, and problems with concentration every day that month, and frequently experienced nausea, aura, light-headedness, throbbing, and problems with vision. Id. Plaintiff was able to function on three (3) days that month, and was unable to function on twenty-five (25) days. Id. His medication included Propralolo [sic]. Id. Plaintiff also listed a low heart rate between 54-58 that month, and could not sleep. Id.

In another monthly form that Plaintiff did not date - but presumably was either April or May of 2013 due to its location in the record between the reports for March and June - on a scale of one (1) to ten (10), the severity of Plaintiff's headaches ranged from six (6) to ten (10). (R. 244). On the majority of days in this report, Plaintiff's headaches lasted thirteen (13) to twenty-four (24) hours; on six (6) days that month, they lasted from four (4) to twelve (12) hours. Id. Plaintiff had sensitivity to light and sensitivity to sound every day that month, and frequently experienced nausea, aura, and throbbing. Id. Plaintiff was able to function on three (3) days that month, and was unable to function on twenty-five (25) days. Id. His medications included

Gabapentin, Proloprapol [sic], and Imitrix. Id. Plaintiff reported on the line for Gabapentin that "nose bleeds stopped," and indicated that "Imixtrex helps once a week for 4-5 hour [sic] but migraines come back that day;" "does not work if used more then [sic] once a week." Id.

In June 2013, on a scale of one (1) to ten (10), the severity of Plaintiff's headaches ranged from eight (8) to ten (10). (R. 243). On the majority of days in June, Plaintiff's headaches lasted thirteen (13) to twenty-four (24) hours; on three days that month, they lasted from four (4) to twelve (12) hours, and on one day that month, his headache lasted less than four (4) hours. Id. Plaintiff had sensitivity to light and throbbing every day that month, and frequently experienced nausea, aura, light-headedness, disconnect, disconcertion, and sensitivity to sound. Id. Plaintiff was able to function on two (2) days that month, and was unable to function on twenty seven (27) days. Id. His medications included Verapamim and allergy shots once a week to "try to help triggers." Id.

In a headache diary listed for "July" [presumably, 2013] the severity of Plaintiff's headaches ranged from seven (7) to ten (10) (R. 242). A majority of his headaches lasted from thirteen (13) to twenty-four (24) hours, while some lasted four (4) to twelve (12) hours. Id. That month, Plaintiff had sensitivity to light, sensitivity to sound, and concentration problems daily. Id. He frequently had nausea, throbbing, and aura. Id. Plaintiff was able to function on three (3) days of the thirty (30) days recorded in the diary; on the other twenty-seven (27) days, he was not able to function. Id. For July, his listed medications in this diary included Verapamim, Sumatriptan, and Lexapro. Id.

### 3.  Report of Contact Form

On October 10, 2012, a Report of Contact form indicated that Plaintiff had an EEG and C-Scan, which needed to be reviewed by Social Security in considering his determination (R.

240). Plaintiff indicated that he would be seeing a neurologist once the test results were available. Id.

### F. Lifestyle Evidence

#### 1. Adult Function Report

On February 23, 2012, Plaintiff completed an Adult Function Report with the help of his girlfriend, Darla Feiler (R. 220). Plaintiff listed the following conditions limiting his ability to work: fatigue, tiredness, dizziness, feeling faint, hot flashes, blacking out, lights make him dizzy, he forgets where he is, pressure in his head and eyes, and sharp pains in his head (R. 213). Plaintiff described his daily acitivities:

> I get up daily at 5:00 am, from a sleepless night of rest, I sit in my living room chair and try to watch tv, at 10 AM I go back to bed til 2 pm, I get up and eat – surf the net, and watch more tv – in bed by 8 pm.

(R. 214). Before Plaintiff's medical problems began, he was able to work, hunt, fish, shop, drive, and "enjoy life;" none of which he can do now. Id. He needs to be reminded to take his prescribed medicines (R. 215). Plaintiff is able to make himself basic meals such as sandwiches and canned soup, but only uses a microwave to cook. Id. He does laundry and cleans, but cannot mow grass, shovel show, or make repairs without help, because it makes him dizzy. Id. He goes outside for an hour each day (R. 216). He can go out alone, but does not drive due to his conditions and does not have a valid driver's license. Id. He shops primarily online. Id.

As to hobbies, Plaintiff used to hunt, fish, and hike, but cannot any longer; he is now limited to watching television (R. 217). He does not go anywhere on a regular basis. Id. Plaintiff has become withdrawn from social activities and finds it hard to focus and follow in conversation. Id.

All of Plaintiff's physical abilities are affected by dizziness and confusion – lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using his hands, seeing, and hearing (R. 218). He can walk for thirty (30) minutes before he has to rest for fifteen (15) minutes in order to resume. Id. His mental abilities are likewise affected by dizziness and confusion – talking, completing tasks, concentration, memory, understanding, following instructions, and getting along with others. Id. He can pay attention for five (5) minutes at a time, and has difficulty finishing what he starts. Id. He does not follow written or spoken instructions very well. Id.

Stress makes Plaintiff's illness worse, as it "causes more pressure" (R. 219). He is paranoid around people. Id. Plaintiff explained that his conditions resulted from an assault years ago: "In 1994 I was assaulted with a blackjack/pipe – hit in the head numberous [sic] times – causing a concussion. I was taken to the hospital where I was admitted and released the next day – after this assault I feel I was never the same after that." Id.

### III.    THE FIVE STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria: An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

> (iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

# IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings (R. 13 – 22):

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since March 1, 2006, the alleged onset date (20 CF'R 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: migraines/headaches, partial seizure disorder, anxiety, depression, and allergies / sinusitis / rhinitis (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the work must never entail climbing ladders, ropes or scaffolds; must entail only occasional climbing of ramps or stairs; must avoid concentrated exposure to extreme cold, heat, wetness, humidity and vibrations; must avoid concentrated exposure to all respiratory irritants such as fumes, odors, gases, poorly ventilated areas and chemicals; must avoid all exposure to unprotected heights, hazardous machinery and no operation of a motor vehicle; and must be limited to simple, routine and repetitive tasks with no strict production quotas, fast pace or production line type of work.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 11, 1967 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## V.      DISCUSSION

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).

"From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." Flack v. Cohen, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the Secretary's findings, and that his conclusion is rational." Vitek v. Finch, 438 F.2d 1157, 1158 (4th Cir. 1971). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the

proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff's overarching contentions are that:

1. Because Dr. Rahman's treating source opinion is supported by the evidence of record and is not contradicted by other substantial evidence then this Court must find that the ALJ erred in wholly discounting the opinion of Dr. Rahman.

2. Because the ALJ applied an improper credibility standard and did not explain how Mr. Louk's activities of daily living were inconsistent with his headache limitations, then this Court must remand this claim to allow Mr. Louk's statements concerning the intensity, persistence, and limiting effects of his conditions be reviewed in conjunction with the Commissioner's rules.

(ECF No. 12). Defendant's overarching contentions are essentially that the ALJ followed the controlling regulations in 1) evaluating the credibility of Plaintiff's subjective complaints, and in 2) evaluating Dr. Rahman's opinion (ECF No. 14).

## C. Credibility Determination

The determination of whether a person is disabled by pain or other symptoms is a two-step process. <u>See</u> <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996); <u>see also</u> 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[1] capable of causing the degree and type of pain alleged. <u>See</u> <u>Craig</u>, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. <u>Id.</u>

---

[1] Step one is fulfilled here. The ALJ in her decision found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" (R. 17). Thus, the Court addresses only Step Two.

Social Security Ruling 96–7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, which include:

> 1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996).

The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's assessment of the claimant's credibility is given great weight, when it is supported by the record. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

As to the first factor, daily activities, the ALJ found that Plaintiff "has failed to demonstrate activities of daily living that are so limited that they would prevent him from sustaining gainful work activity" (R. 17). That is, of course, not a correct statement of the law. A

plaintiff's daily activities, limited or otherwise, would not prevent him from sustaining gainful work activity. Rather, a plaintiff's daily activities are relevant evidence as to the severity of an impairment. Craig v. Chater, 76 F.3d at 595.

Here, the ALJ determined, presumably, that Plaintiff's daily activities contradicted his claims regarding intensity, persistence and limiting effects of his symptoms. The ALJ stated that the following factors "detract from the credibility of the claimant's allegations concerning the severity of his symptoms," and provided this paragraph:

> As to the claimant's credibility, the undersigned does not find him to be fully credible. The claimant testified that he lives alone. His girlfriend visits him and they go shopping. The claimant stated that his mother pays all his bills. He testified to having current health insurance. The claimant stated that he is able to take care of all his personal care on a daily basis. The claimant stated that he cooks daily, makes sandwiches and soup. He reported weekly laundry and cleaning every two weeks. He also watches television and does weekly on line computer shopping. The claimant is able to read, write, do math and count change. He goes outside daily and sits on his porch. Therefore, the undersigned found the claimant has failed to demonstrate activities of daily living that are so limited that they would prevent him from sustaining gainful work activity. In addition, a psychological consultative evaluation by Sharon Joseph Ph.D. Dr. Joseph noted the claimant gets up at 5 a.m. and watches television in the afternoon and evenings. He goes to bed at 8 p.m. He is able to make the bed, run the vacuum, and wash dishes. He is able to cook a meal, put groceries away, and go up and down stairs. He also was able to take out the garbage and go shopping.

(R. 17). As a preliminary matter, it is patently unclear how the fact that Plaintiff's mother pays his bills, or that Plaintiff lives alone, has a girlfriend, and has health insurance are relevant to – much less detract from - credibility or daily activities; nor has the ALJ provided any explanation that connects these facts to that conclusion. As to the items in that paragraph that *are* actually daily activities, the ALJ has rather selectively excised and curated only certain portions of Plaintiff's statements, leaving them divorced from context.

That is, to say that Plaintiff "cooks" daily portrays the meager meal preparation he engages in as something much grander than it is. In fact, Plaintiff no longer uses his stove:

> Q     Okay. As far as your daily activities, do you – are you able to prepare meals for yourself?
>
> A     When the migraines and stuff are not happening – I won't cook on the stove no more, because I left it on there one night because I had to just go to bed, so I left there. But I can cook in the microwave and stuff.
>
> She usually makes me big -- like big lasagna and stuff that I keep in the refrigerator and just warm it up in the microwave and stuff.

(R. 57). Thus Plaintiff does not "cook daily," but is limited to microwaving food his girlfriend has made for him, or canned soups, etc. Plaintiff does try to do his laundry, handle groceries, and take out the trash, *within the confines and limits of his condition*; he stops all of these activities as needed when headaches or overexertion compel him to:

> Q     Okay. Are you able to do any cleaning, like your laundry, or vacuum, mopping?
>
> A     On them days that -- yeah, on them days I wash a little clothes or something like that, and try to do some of -- like she was asking me about my bills, try to read some of that stuff.
>
> But if it gets too long, it'll start messing me up with them lights and stuff, so I kind of have to ask her to help me with them.
>
> Q     Okay. What percentage of the household chores do you think your girlfriend's doing for you?
>
> A     Oh, 85 percent of them, 80 percent.

(R. 58). Plaintiff does indeed watch some television, though he must watch it on the darkest setting, does not watch television for long, and stops when the lights bother him (R. 58-59):

> Q     Okay. How do you spend most of your days? How do you pass your time?
>
> A     If I'm not in bed, watch TV -- a little TV. I have to turn it all the way dark where I can, you know, stand watching it. Go out and sit on the porch, and maybe go for a little walk or something. And try to clean my clothes and stuff. But nothing that I -- I said I have to stop if something – them lights start, if I get nauseous, I have to stop everything.

As to "his girlfriend visits him and they go shopping," the ALJ has not explained how Plaintiff's *girlfriend's* ability to come visit *him* is relevant, nor can the undersigned intuit what the rationale might be – especially given that Plaintiff does not drive, rarely leaves his home, and does not visit *her*. Plaintiff also testified that he primarily shops online (R. 216), and when he does venture out with his girlfriend, he sometimes stays in the car to avoid lights in stores that

bother him: "[I]f I'm having a halfway okay day, I'll go to the store with her, but I'll sit in the car, because I won't go in with lights and stuff" (R. 57).

The ALJ also cites Plaintiff's ability to sit outside on his porch as evidence of daily activities that contradict his claims. Without explanation, the undersigned is unable to intuit how sitting on a porch could negate Plaintiff's credibility. The undersigned also notes that Plaintiff does not drive and is dependent upon others for transportation:

> Q     And have you ever had a valid driver's license?
> A     Yes.
> Q     Okay.
> A     Since '06, I've never renewed it after I started -- couldn't drive.
> Q     And that was because of?
> A     My migraines and -- like when I drive, I would see things come out of the sides of the roads that wasn't there and stuff. It scared me.
> Q     So you do not drive at all right now?
> A     No.
> Q     Okay. And how did you get to the hearing today?
> A     My girlfriend.

(R. 39; see also R. 71, R. 216, and R. 292). The ALJ failed to mention this significant fact regarding daily activities even once in her opinion.

The ALJ has thus characterized Plaintiff's daily activities in a way that is inconsistent with his testimony, without an explanation or rationale for discounting the parts of his testimony that have been selectively removed. Indeed, an ALJ may not selectively discuss only the evidence that favors his conclusion. Forquer v. Commissioner of Social Security, No. 1:15CV57 (N.D. W.Va. 2015) (holding that an ALJ's failure to discuss the evidence proffered by a Plaintiff which appears repeatedly within the record violates that prohibition as cited in Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995)). Other daily activities are cited, but without explanation as to how they weighed against Plaintiff, and what that explanation might be is not apparent. As such, these findings are not supported by substantial evidence.

Beyond this infirmity, additionally, a claimant's daily activities are relevant evidence when assessing his alleged symptoms. See 20 C.F.R. § 404.1529. However, "[w]e have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." Craft v. Astrue, 539 F.3d 668, (7th Cir. 2008) (quoting Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).  Indeed, in contrast, the types of daily activities that negate credibility include significantly more demanding activities than the ones described by Plaintiff here. See Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001) (Riding a bike, walking in the woods, and traveling to distant states without significant difficulty undermined claimant's subjective complaints of pain and fatigue).  See also Meyer v. Astrue, 662 F.3d  700 (4th Cir. 2011) (driving, caring for horses and dogs, riding horses and operating a tractor was conflicting evidence); Kearse v. Massanari, 73 Fed.Appx. 601 (4th Cir. 2003) (cutting wood, mowing grass, and occasionally shopping contradicted a disability determination). Plaintiff's daily activities here clearly are not of such caliber as to negate his credibility under our precedent, when fairly considered. Further, substantial evidence cannot be found in the ALJ's opinion to support her findings to the contrary.

Apart from daily activities, as to the fourth factor, the ALJ also notes that Plaintiff "admitted that he is not currently taking an anti-depressant" (R. 16). However, the *reason* Plaintiff stopped taking his anti-depressant – disturbing side effects - was both documented in the record as well as medically advised by one of his treating physicians. PA-C Spotloe noted that she was weaning Plaintiff off of Lexapro because "it caused hallucinations and weird dreams" (R. 355). The record shows no instance where Plaintiff attempted to obscure that fact; in fact, he was forthcoming about his cessation:

Q       Okay. Now, are you also being treated for depression and anxiety?

| | |
|---|---|
| A | Yes. *I just got off of -- I forget what the drug was, but I just got off, because it was a nasty thing, antidepressant drug.* Can't remember what it was. |
| Q | So you were having side effects from it? |
| A | Yeah. Bad. Hallucinations, things were weird. At night and stuff I'd see things moving and stuff. Yeah, that was nasty. |
| Q | So are you currently taking any medication for depression? |
| A | *I don't take them drugs for depression.* |
| Q | Okay. |
| ALJ: | I'm sorry. I didn't hear the answer. |
| WTN: | I don't think them drugs are -- the ones I am taking are for depression. |
| ALJ: | So the answer would be currently you're not taking – |
| WTN: | *No.* |
| ALJ: | -- any drugs for depression. |
| WTN: | *No, no.* |
| ALJ: | Okay. Thank you. |

(R. 55-56) (emphasis added). A credibility finding must be "supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning."

Craft v. Astrue, 539 F.3d at 678. The ALJ's opinion here falls well short of that standard.

## D. Evaluation of Medical Opinion

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating source medical opinions:

> *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find

that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating

relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great weight because they "reflect[] an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig v. Chater, however, the Fourth Circuit further elaborated on this rule:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and  laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not absolute." See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

Some issues are reserved specifically for the Commissioner and opinions on such issues "are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure to do this "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th

Cir. 1974)). An ALJ is not required to mention every piece of evidence, but must at minimum provide an "accurate and logical bridge" between the evidence and her conclusion such that would permit meaningful judicial review. Craft v. Astrue, 539 F.3d at 673.

Here, the record contained five opinions from two treating physicians, two agency reviewers, and one reviewer for the Department of Health and Human Resources (DHHR). The ALJ afforded little weight to *all five opinions*. Agency reviewers Lauderman and Bartee were afforded little weight, with no evident explanation as to why (R. 20). DHHR reviewer Harris was afforded little weight because he is not familiar with the SSA standards and regulations, and because the ALJ determined his opinion was "inconsistent with the evidence in the decision," though no further explanation as to inconsistency is provided beyond that conclusion (R. 21). PA-C Spotloe's opinion that Plaintiff was not suitable for work was afforded little weight because the "ALJ believe[d] that this source's findings are inconsistent with the ongoing daily activities of the claimant, and the benign objective findings" (R. 19). "Despite Dr. Rahman's status as a treating source," the ALJ afforded his assessment little weight because "the limitations assessed by this source are so extreme as to appear implausible," and "these limitations are not supported by Dr. Rahman's treatment notes or the claimant's activities of daily living" (R. 19).

As discussed in detail above, the ALJ's analysis of daily activities is neither logical nor supported by substantial evidence; under these circumstances, daily activities cannot weigh against the medical opinions in the record. Of particular concern is the statement that DHHR reviewer Harris' assessment was "inconsistent with the evidence in the *decision*" (R. 21) (emphasis added). The relevant question is whether his opinion is consistent with the evidence in the *record*, especially given that the evidence in the ALJ's decision is largely invalid.

As to Dr. Rahman's treatment notes, a treating physician is not credible when his treatment was infrequent, and his opinion was unsupported by his own treatment notes or other information in the file. Russell v. Comm'r of Soc. Sec., 440 Fed.Appx. 163 (4th Cir. 2011). A treating physician also loses credibility when her testimony is directly contradicted by her own treatment notes. Burch v Apfel, 9 Fed. Appx. 255 (2001) (Treating physician given little credibility when she testified that 1) Claimant was admitted to the hospital for suicidal thoughts, when her notes clearly indicated Claimant's condition was stable and she was not considered harmful to herself or others; 2) Claimant's poor response to medication was not her fault, when treatment notes clearly indicated otherwise – "as usual she had not given the medication adequate time to reach some degree of remission;" 3) Claimant's alcohol consumption did not contribute to her failure to recover, when notes indicated Claimant continued to drink against physician's advice and that it was "not beneficial;" and numerous other contradictions and inconsistencies discussed at length by the ALJ).

Here, there is nothing in Dr. Rahman's treatment notes that even remotely resembles the situations contemplated in our precedent outlined above that would negate a treating physician's credibility. Further, Dr. Rahman's treatment of Plaintiff was frequent, and his notes longitudinally support Plaintiff's diagnosis of severe headaches and ongoing treatment for same. Dr. Rahman never indicated any doubt as to Plaintiff's claims *in their entirety* (nor did a second treating medical source, a DHHR reviewer, and a *headache specialist*, Dr. Watson). The ALJ provided no rationale as to how Dr. Rahman's treatment notes did not support his assessment, and the ALJ's recounting of his treatment notes likewise provides no ascertainable clues (R. 17-18). The ALJ stated that "in February 2013, the claimant stated Propranolol helped his

migraines," and that "On April 30, the claimant reported Imitrex helped his headaches" (R. 18). Yet, as the record makes abundantly clear, "helped" is a rather subjective term.

On April 30, 2013, at Plaintiff's follow up with Dr. Rahman for headaches, migraine frequency had increased to at least five (5) days per week (R. 332). Imitrex was helping reduce his headaches *to 4-5 hours in duration*. Id. (emphasis added). On July 30, 2013, Plaintiff reported to Dr. Rahman having four (4) to five (5) migraines per week, with headache pain rated 10/10 at worst, and 6-7/10 at best (R. 331). Imitrex *worked somewhat, but was limited in that it only worked 1-2 times per month.* Id. (emphasis added). On December 23, 2013, PA-C Spotloe noted that "Imitrex will help, but *only brings pain to a "5" on 1-10 scale*," and that "*headaches will still persist*" (R. 357) (emphasis added). On August 12, 2014, Dr. Watson at WVU Headache Center noted that "Imitrex takes the edge off *some of the time*" (R. 376) (emphasis added). In fact, at that very same visit, Dr. Watson considered Imitrex of such limited utility to Plaintiff that he "prescribed Maxalt to evaluate *if it would be more effective than Imitrex*." Id. (emphasis added). Clearly, Imitrex was not as helpful as the ALJ maintains, which Plaintiff also explicitly told her himself at the hearing:

> Q:    Okay. Have any of the medications you've tried up to this point controlled the migraines?
> A:    The only thing that even diminishes it any is that Imitrex. *And I can only take it once a week or it does not work. But it will diminish it from a 10 to a 7*, and then I can, you know, get up and go to the bath, take a shower and stuff like that on them days.

(R. 54) (emphasis added). As to Proprolonol, Plaintiff had to discontinue it in order to undergo other treatment; and likewise, while he was taking it, his headaches persisted. As such, the ALJ's rationale[2] with regard to medications "helping" is wholly unsupported by substantial evidence.

_____

[2] "Based on the medical evidence of the record discussed below, the undersigned finds that the claimant's allegations as to the intensity, duration, and limiting effects of his impairments are not entirely credible when viewed the record as whole and do not preclude the work activity prescribed in the residual functional capacity. While the

The ALJ also stated "The available evidence shows in January 2009, the claimant was treated at the [sic] Barbour Health and Rehabilitation for sinus headache, dizziness, and blurry eyes. The claimant reported a pain level of "five"; however, the record shows that the claimant's progress was slow but steady" (R. 18). At best, this is a selective curation of half-truths.

A careful reading of the record reveals that on January 12, 2009, Plaintiff's prognosis was listed as "good," with "progress as expected," *at the beginning of his treatment* with Barbour Health and Rehabilitation (R. 275). On January 20, 2009, there was no change in his condition or complaints; his pain was still rated as a five (5), he was still missing work, and was still feeling "foggy" and dizzy (R. 270). On January 22, 2009, Plaintiff complained of worsening head pain, rated six (6) on a scale of one (1) to ten (10), and continued to miss work. (R. 268). His prognosis at that time was downgraded to "fair," with progress "slow but steady" (R. 269). Thus, Plaintiff's reported pain level increased from a "five" to a "six" in a very short period of time, and his headaches were in fact worsening. Plaintiff's prognosis, despite how the ALJ selectively presented it, had also *worsened* in just ten days of treatment, when it became apparent that treatment was less effective than initially expected.

Having found no substantial evidence to support the second and third purported rationales of the ALJ for affording little weight to a treating source ("these limitations are not supported by Dr. Rahman's treatment notes or the claimant's activities of daily living"), that leaves only the first rationale: "the limitations assessed by this source are so extreme as to appear implausible" (R. 19). The ALJ provides no clear rationale to support that argument, and it is not evident from

---

claimant reported he continues to experience debilitating headaches, he has received proper treatment and he reports his headaches improved with medications. Further, he has not been hospitalized for this impairment, which supports his medication is reducing the severity of his headaches and the evidence, including his activities and treatment notes, do not support the frequency of headaches that he alleges." (R. 20).

a review of her opinion – apart from her own personal skepticism – leaving no valid reason for affording Dr. Rahman little weight.

The ALJ also stated that "Dr. Rahman opined that these headaches would preclude the claimant from performing even basic work activities. Yet, he contradicted his assessment by concluding the claimant could perform low stress jobs" (R. 19). There is no further explanation, and no contradiction is evident from Dr. Rahman's RFC. That is, Question 20 of the RFC asks, "*During times your patient has a headache*, would your patient generally be precluded from performing even basic work activities . . . ?" Dr. Rahman checked "Yes" in response (R. 349) (emphasis added). Question 22 asks, "To what degree can your patient tolerate work stress?" to which Dr. Rahman checked "Capable of low stress jobs" (R. 350). There is no apparent inconsistency between these two statements. Question 20 is tailored narrowly to what Plaintiff can do *during a headache*, whereas Question 22 was a much broader question in relation to work stress generally. There is no doubt that Plaintiff is more limited when he is in the midst of a migraine. Therefore, this, too, is unpersuasive, and there is no substantial evidence to support affording less weight.

In summary, the ALJ appears to have essentially discarded the opinion of Dr. Rahman, a treating specialist with longitudinal treatment of Plaintiff, and the concurring opinions of numerous other medical sources, in favor of her own wholly inaccurate interpretation of the objective medical evidence, which is impermissible. An ALJ may not cross "the line between considering the evidence of record and 'playing doctor' by drawing his own medical conclusions about [a plaintiff's] . . . impairments." Forquer v. Commissioner of Social Security, No. 1:15CV57, 19 (N.D. W.Va. 2015), citing Frank v. Barnhart, 326 F.3d 618, 621-22 (5th Cir. 2003) (noting that ALJ impermissibly made his own independent medical assessments by

drawing his own medical conclusions from medical evidence of record). Further, the evidence cited simply does not support the ALJ's conclusions. Not only does the ALJ's opinion lack an accurate and logical bridge from the evidence to her conclusions, it is difficult to discern so much as a logical footpath.

Upon remand, the ALJ must redo her analysis of Plaintiff's credibility, reviewing all of the relevant factors, and support her conclusion with substantial evidence. Further, she must redo her analysis of weight afforded to each medical opinion, reviewing all of the relevant factors, and support her conclusion with substantial evidence. Upon completion of these two determinations, all relevant steps must be re-completed with proper findings.

## VI.    RECOMMENDED DECISION

For the reasons herein stated, I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED** and this matter be **REMANDED** for the reasons stated forth within.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge.    Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and

Recommendation to counsel of record.

Respectfully submitted this 30th day of November, 2016.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE